# In the United States Court of Federal Claims

No. 22-873C
(Filed Under Seal: May 5, 2023)
(Reissued: May 16, 2023)*
**FOR PUBLICATION**

```
*****************************************
KONECRANES NUCLEAR                        *
EQUIPMENT & SERVICES, LLC,                *
                                          *
              Plaintiff,                  *
                                          *
v.                                        *
                                          *
UNITED STATES,                            *
                                          *
              Defendant,                  *
                                          *
          and                             *
                                          *
IMPSA INTERNATIONAL, INC.,                *
                                          *
              Defendant-                  *
              Intervenor.                 *
                                          *
*****************************************
```

*Suzanne Sumner*, Taft Stettinius & Hollister, LLP, Dayton, Ohio, for Plaintiff. With her on briefs were *Erin R. Davis, Brandon E. Dobyns, Barbara A. Duncombe*, and *Stephen G. Darby*, Taft Stettinius & Hollister, LLP.

*Ioana Cristei*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant, United States. With her on briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Martin F. Hockey, Jr.*, Deputy Director, as well as *Major Michael R. Tregle, Jr.*, Trial Attorney, U.S. Army Legal Services Agency and *Major Ben Hogan*, Trial Attorney, U.S. Army Legal Services Agency.

---

* Pursuant to the protective order in this case, the Court initially filed this opinion under seal on May 5, 2023, for the parties to propose redactions of confidential or proprietary information. The parties were directed to propose redactions by May 19, 2023. A joint notice of proposed redactions was received from the parties. The Court has incorporated the parties' proposed redactions and makes them with bracketed ellipses ("[. . .]" below.

*Scott R. Williamson*, Williamson Law Group, LLC, Bethesda, Maryland, for Defendant-Intervenor, IMPSA International. With him on briefs was *Daniel R. Williamson*, Williamson Law Group, LLC.

## OPINION AND ORDER

Plaintiff Konecranes Nuclear Equipment & Services, LLC ("Konecranes") brings this post-award bid protest challenging the U.S. Department of the Army's decision to award a contract to Defendant-Intervenor IMPSA International, Inc. ("IMPSA"). The parties have filed cross-motions for judgment on the administrative record, and I have heard oral argument.[1] For the reasons discussed below, Plaintiff's motion is **DENIED** and Defendant and Defendant-Intervenor's motions are **GRANTED**. The case is **DISMISSED**.

## BACKGROUND

The Army issued a request for proposals (No. W56HZV-20-R-0025, hereafter "RFP") for a single-award fixed-price contract to acquire two ship-to-shore container cranes. Administrative Record ("AR") 425. The proposals were to be evaluated for "best value" to the government, meaning the final award would be made to the bid that provides the best overall value to the government given the price, not necessarily to the bid with the lowest price. AR 534 § M.1.1. The Army determined that both Konecranes and IMPSA had submitted strong proposals, but that IMPSA's reflected the best value.

### A. Relevant RFP Provisions

Konecranes's claims hinge on the RFP's evaluation and eligibility criteria. The Army amended the RFP seven times, with the fifth amendment providing the final updates germane here.[2] AR 1527. The relevant provisions are as follows.

The RFP contains three sections of relevance. Section C, the statement of work, describes the nature of the work required for performance. AR 1506. Section L provides instructions to offerors about proposal submission, contents, and processing.

---

[1] Pl.'s Mot. for J. on the Admin. Rec. (ECF 22) ("Pl.'s Mot."); Def.'s Cross-Mot. for J. on the Admin. Rec. & Resp. to Pl.'s Mot. for J. on the Admin. Rec. (ECF 25) ("Def.'s Cross-Mot. & Resp."); Def.-Int.'s Cross-Mot. for J. on the Admin. Rec. & Resp. to Pl.'s Mot. for J. on the Admin. Rec. (ECF 23) ("Def.-Int.'s Cross-Mot. & Resp."); Pl.'s Resp. & Reply to Def.'s Cross-Mot. for J. on the Admin. Rec. (ECF 33) ("Pl.'s Resp. & Reply"); Def.'s Reply in Supp. of Def.'s Cross-Mot. for J. on the Admin. Rec. (ECF 35) ("Def.'s Reply"); Def.-Int.'s Reply in Supp. of Def.-Int's Cross-Mot. for J. on the Admin. Rec. (ECF 34) (Def.-Int.'s Reply); Hearing Tr. (ECF 37) ("Tr.").

[2] In addition to this case and the proceedings described in the following section, Konecranes filed a pre-award bid protest objecting to the original terms of the RFP. Compl., *Konecranes Nuclear Equipment & Serv., LLC v. United States*, No. 1:21-cv-1441 (ECF 1). Konecranes filed a motion for voluntary dismissal after the government took partial corrective action. Notice of Voluntary Dismissal, *Konecranes Nuclear Equipment & Serv., LLC v. United States*, No. 1:21-cv-1441 (ECF 21).

AR 1519. Section M elaborates on the evaluation factors the Army was to apply to proposals. AR 1527. The RFP included three evaluation factors: technical, price, and small business participation. AR 1527; *see also* AR 1521–25 § L.4.

Technical evaluation hinged on whether the proposal contained three required certifications: (1) a quality system meeting the International Organization for Standardization ("ISO") 9001 requirements, AR 1529 § M.4.1.1.1; (2) an inspector certified by the American Society for Nondestructive Testing, AR 1529 § M.4.1.1.2; and (3) a professional engineer license for the offeror's engineer of record or subcontracted review engineer in various specialties, AR 1529 § M.4.1.1.3. For each certification, the RFP provided that offerors with the certification would be assessed as "low risk," while offerors who could not demonstrate certification "may be assessed as higher risk for this requirement." AR 1529 §§ M.4.1.1.1–.3. At the same time, the RFP did not require or reward presentation of certifications *beyond* the ones specified: "No evaluation credit will be given for providing data that exceeds the requirements identified above." AR 1529 § M.4.1.2.

The intended result of the Army's technical evaluation was an adjectival technical rating (*i.e.*, outstanding, good, etc.) and an adjectival risk rating (*i.e.*, low risk, moderate risk, etc.). AR 408. The technical rating called for a comparison of a proposal's strengths and weaknesses. The Source Selection Plan defined a strength as "an aspect of an offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance." AR 423. A weakness, in contrast, was "a flaw in the proposal that increases the risk of unsuccessful contract performance." *Id*. Risk referred to "the potential for unsuccessful contract performance." AR 422. The adjectival technical and risk ratings had defined meanings as well. AR 408.

For the price evaluation, the RFP required the Army to determine if each offeror's proposed price was reasonable. AR 1529 § M.4.2.1.2. The Army was authorized to assess reasonableness using any of the analytical techniques listed in Federal Acquisition Regulation ("FAR") 15.404-1 (codified at 48 C.F.R.). *Id*. The RFP also required the Army to evaluate proposals for unbalanced pricing, which exists when "the price of one or more contract line items is significantly over- or understated as indicated by the application of cost and price analysis techniques." AR 1529–30 § M.4.2.1.3.

In addition to the evaluation criteria, two independent RFP requirements are at issue. First, the Army had an affirmative duty to make a responsibility determination for any prospective awardee. *See* FAR 9.103. To be deemed responsible and eligible for an award, a bidder must demonstrate compliance with the standards

in FAR 9.104. As part of this responsibility determination, the RFP stated that the Army "reserve[d] the right" to conduct a pre-award survey on any or all offerors or their subcontractors, which could involve a site visit or requests for financial or other background information. AR 1528.

Second, because the RFP contemplated delivery of "materials handling equipment," it was subject to the Trade Agreements Act ("TAA"), 19 U.S.C. §§ 2501 *et seq.*, in accordance with Defense Federal Acquisition Regulation Supplement ("DFARS") 225.401-70. AR 430. As such, the Army could only consider offers for U.S.-made, qualifying-country, or designated-country end products unless certain exceptions applied. AR 430; *see also* DFARS 252.225-7021.

## B. Submissions, Award, and Subsequent Proceedings

The Army initially received three bids. One offeror withdrew, leaving only Konecranes and IMPSA. AR 1951, 2023, 2636.

Both Konecranes and IMPSA were "known vendors in the crane manufacturing industry[.]" AR 376. Konecranes is a manufacturer based in the United States. AR 1954. IMPSA is a subsidiary of Industrias Metalurgicas Pescarmona S.A.I.C.F.-IMPSA ("IMPSA S.A."), based in Argentina. AR 3410. IMPSA, the subsidiary, is a small entity with no manufacturing facilities of its own. *See* AR 259, 262, 3369; Pl.'s Mot. at 10–11. It had, however, previously supplied four container cranes to the Department of the Navy in 1993 and 2000. AR 376; *see also* AR 260 (describing crane manufacturing history). IMPSA supported its proposal with an ISO 9001 certification covering IMPSA S.A., AR 2025, 3397, a certification for a nondestructive testing inspector, AR 2026–28, and licenses for professional engineers, AR 2029–37. Konecranes likewise supported its proposal with its own certifications and licenses. AR 1954–59.

For the technical evaluation, the Source Selection Authority ("SSA") assigned both IMPSA and Konecranes a rating of outstanding with low risk, with each proposal receiving three strengths and no weaknesses. AR 2873

For its price evaluation, the SSA conducted three of the analyses listed in FAR 15.404-1(b): comparison of offers, comparison to an independent government cost estimate ("IGCE"),[3] and assessment of offer price data and assumptions. AR 2744–51, 2783–84; FAR 15.404-1(b)(2)(i), (v), (vii). The SSA determined that IMPSA's price was reasonable under each analysis. AR 2783–84. The SSA determined that

---

[3] An IGCE is intended to "represent [an] agency's best estimate of the most reasonable current price of the products or services being procured." *Process Control Techs. v. United States*, 53 Fed. Cl. 71, 77 (2002) (quoting John Cibinic, Jr. & Ralph C. Nash, Jr., Formation of Government Contracts 1317 (3d ed. 1998)).

- 4 -

Konecranes's price was reasonable too, but only under the third reasonableness analysis method. AR 2751; *see also* FAR 15.404-1(b)(2)(vii).

To assess responsibility and verify other information, the contracting officer asked the Defense Contract Management Agency ("DCMA") to conduct pre-award surveys on the offerors. Supplemental Administrative Record ("Supp. AR") 3560–80. The DCMA evaluated Konecranes's facilities and technical capabilities during the pre-award survey. AR 3302–3312. The DCMA initiated an investigation of IMPSA, but was unable to pursue a survey of IMPSA S.A. facilities abroad and canceled those aspects of the survey. Supp. AR 3574–81.

In the course of the IMPSA pre-award survey, the Army became concerned that IMPSA's proposal would not comply with the TAA. Supp. AR 3579. The Army accordingly issued an evaluation notice to IMPSA asking it to demonstrate TAA compliance. AR 2356–57. IMPSA represented that the cranes would be erected in Colombia, Panama, or Chile, which are all considered designated countries under the TAA. AR 2527. IMPSA explained that parts would be sourced worldwide, but that the cranes would be "assembled under direct supervision by IMPSA with local labor and equipment into sub-assemblies and then erected into cranes" for export to the United States, "thereby satisfying DFARS clauses in the solicitation." *Id*.

Having determined that both Konecranes and IMPSA had made technically outstanding offers with low risk and that IMPSA complied with the TAA, the SSA turned to the determinative questions of responsibility and best value. Although the government had not been able to survey IMPSA S.A.'s facilities, the SSA determined that IMPSA was responsible. AR 2898–900. As for best value, Konecranes's proposed price was [. . .] and IMPSA's proposed price was $47,944,815. AR 2783. Because IMPSA's price was [. . .] than Konecranes's and the proposals were otherwise comparable, AR 3078–84, the SSA awarded the contract to IMPSA. AR 2973.

Konecranes filed a protest of the award with the Government Accountability Office ("GAO"). AR 3114–30. In response, the Army issued a stop work order to IMPSA and agreed to take corrective action including: (1) re-evaluation of IMPSA's technical proposal; (2) a new responsibility determination; and (3) a new best-value determination. AR 3113, 3391.

For its re-evaluation of IMPSA's technical proposal, the Army requested additional information about the ISO 9001 certification held by IMPSA S.A. AR 3396–97. IMPSA responded that it and its parent company "operate as an integrated enterprise, with shared management, common policies, and shared resources," and that its parent company's ISO certification would "cover the quality management system that will be used in performance of this contract." *Id*. The SSA determined

that reliance on IMPSA S.A.'s certification created some risk, and assigned IMPSA an additional weakness for the ISO 9001 certification technical subfactor. AR 3545. But the SSA determined that because IMPSA's response sufficiently addressed how the ISO certification covered its quality management system, the risk was low. *Id.* The SSA therefore once again assigned the same overall technical rating (*i.e.*, outstanding with low risk) to Konecranes and IMPSA. *Id.*

For the Army's new responsibility determination, the DCMA conducted an additional pre-award survey of IMPSA. AR 3398. The DCMA assigned IMPSA a moderate risk due to its lack of on-site manufacturing capability and verifiable delivery information, but it nonetheless recommended complete award to IMPSA because its capabilities, including its reliance on the resources of its parent company, were adequate. AR 3398–402. The DCMA also conducted a search of IMPSA for exclusion records and confirmed that IMPSA had a counterfeit mitigation policy in place. AR 3399; Tr. at 87–88.

After assigning the same technical ratings to IMPSA and Konecranes and determining that IMPSA was responsible, the SSA determined once again that IMPSA represented the best overall value to the government because of its lower price. AR 3543–48.

## DISCUSSION

### I. Jurisdiction

To reach the merits of the case, I must first determine that the Court has jurisdiction over Konecranes's claims. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). This Court's jurisdiction in bid protests rests on the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, § 12(a)–(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)); *see Dyonyx, L.P. v. United States*, 83 Fed. Cl. 460, 464–65 (2008). The Tucker Act now grants this Court jurisdiction "to render judgment on an action by an interested party objecting to … the award of a contract or any alleged violation of statute or regulation in connection with a procurement[.]" 28 U.S.C. § 1491(b)(1).

"[S]tanding is a threshold jurisdictional issue," *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002), and only an "interested party" has standing to challenge a solicitation. *Digitalis Educ. Sols. Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012). To establish that it is an interested party, a plaintiff must show (1) that it is an "actual or prospective bidder" and (2) that it "possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing *Myers Investigative*, 275 F.3d at 1369 (itself citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992))).

Here, there is no dispute that Konecranes meets the two-part test, and the government does not contest that Konecranes is an interested party. Tr. at 71. First, Konecranes was an actual bidder who submitted a proposal. AR 2726. Second, Konecranes has the requisite economic interest. The Federal Circuit has held that in order to show a direct economic interest, a plaintiff must "establish that it had a substantial chance of securing the award." *Myers Investigative*, 275 F.3d at 1370. As the only other offeror in addition to IMPSA who also met the solicitation's technical requirements, Konecranes had a substantial chance of winning the award. *See McVey Co., Inc. v. United States*, 111 Fed. Cl. 387, 405 (2013).

## II. Merits

This Court reviews bid protests "pursuant to the standards set forth in section 706 of title 5," *i.e.*, the Administrative Procedure Act. 28 U.S.C. § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). The protester must show that the agency's action was arbitrary and capricious and that it was prejudiced by the agency's conduct. 5 U.S.C. § 706; *see also, e.g.*, *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). When resolving motions for judgment on the administrative record under Rule 52.1(c), this Court proceeds "as if it were conducting a trial on the record." *Bannum*, 404 F.3d at 1354 (addressing former RCFC 56.1); *see also Young v. United States*, 497 F. App'x 53, 58–59 (Fed. Cir. 2012).

There are two bases for setting aside government procurements as arbitrary and capricious: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *see also Bannum*, 404 F.3d at 1351; *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000). The first route involves determining "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1332–33 (quotes omitted) (citing *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). To succeed, "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* at 1333 (quotes omitted) (citing *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)). The second route requires the disappointed bidder to "show a clear and prejudicial violation of applicable statutes or regulations." *Id.* (quotes omitted). In either case, this Court's review is "highly deferential" to agency decision-making, *Advanced Data Concepts*, 216 F.3d at 1058 — especially in an award based on best value, where "the contracting officer ha[s] even greater discretion than if the contract were to have been awarded on the basis of cost alone." *Galen Med. Assocs., Inc. v. United States*, 369

F.3d 1324, 1330 (Fed. Cir. 2004); *see also Cleveland Assets, LLC v. United States*, 883 F.3d 1378, 1382 (Fed. Cir. 2018).

### A. Evaluation Factors

Konecranes argues that the Army's technical and price evaluation of IMPSA's proposal was irrational and inconsistent with the RFP's evaluation factors. *See* Pl.'s Mot. at 9–15, 22–27. I disagree.

#### 1. ISO Certification

As mentioned above, offerors were asked to provide an ISO 9001 certification. AR 1529 § M.4.1.1.1.[4] Konecranes argues that the Army misapplied the RFP's evaluation criteria when it accepted the ISO 9001 certification of IMPSA's parent company, IMPSA S.A. Pl.'s Mot. at 10–11.

Konecranes's theory is that because the technical evaluation subfactor for ISO 9001 certification cross-referenced part of the statement of work in Section C of the RFP, technical evaluation had to include Section C requirements as well. *See* AR 1529 § M.4.1.1.1 (referencing § C.3.3); Pl.'s Mot. at 9–10. The cross-referenced language in Section C stated that "[t]he Contractor … shall have a quality system that shall be certified by an ISO accredited third party registrar to meet the requirements of ISO 9001, or the Contractors quality system shall address each of the elements of ISO 9001." AR 461 § C.3.3.1. Because the Section C language is phrased in mandatory terms — Konecranes reasons — IMPSA was ineligible for award without its own ISO certification. Pl.'s Mot. at 10–11.

That misunderstands how the RFP provisions interact.[5] The evaluation criteria in Section M and the statement of work in Section C are separate sections of

---

[4] The technical evaluation subfactor provided that:

> The Government will assess the risk associated with the Offerors ability to demonstrate that it will meet the following requirements:
> M.4.1.1.1 ISO certification for quality system by an ISO accredited third party registrar to meet the requirements of ISO 9001 (SOW Section C.3.3)
> If the offeror provides an ISO certification for quality system by an ISO accredited third party registrar to meet the requirements of ISO 9001 in the proposal, the offeror will be assessed as low risk for this requirement. If the offeror does not provide the certification in the proposal, the offeror may be assessed as higher risk for this requirement.

AR 1529 § M.4.1.1.1.

[5] When interpreting an RFP, this Court begins with the plain language. If the provisions of the RFP are "clear and unambiguous, they must be given their plain and ordinary meaning." *Banknote Corp.*, 365 F.3d at 1353. The Court must consider the RFP as a whole and interpret it "in a manner that harmonizes and gives reasonable meaning to all of its provisions." *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1344 (Fed. Cir. 2021) (quotes omitted).

the RFP that serve distinct purposes: Section M governs evaluation of offers for award, while Section C governs contract performance. AR 1506, 1527. Konecranes's interpretation also ignores the remaining language of the evaluation subfactor, which contemplates that offerors might not provide an ISO certification and permits the Army to assign such offerors a higher risk. AR 1529 § M.4.1.1.1 ("If the offeror does not provide the [ISO] certification in the proposal, the offeror may be assessed as higher risk for this requirement."). Lack of certification is thus not a bar to award, but simply a fact for the Army to consider — as it did here. AR 3539, 3545. Konecranes now concedes that the ISO certification was not mandatory. Tr. at 15.

Konecranes relatedly claims that IMPSA's manufacturing subcontractors must also have an ISO certification. Pl.'s Mot. at 15. But Konecranes does not point to any language in the evaluation factors imposing any such requirement, only language in the statement of work. *Id*. Considering subcontractor certification thus would have meant applying an unstated evaluation criterion, which is not permitted. *See* 41 U.S.C. § 3701(a); FAR 15.305(a); *Banknote Corp. of America, Inc. v. United States*, 56 Fed. Cl. 377, 386 (2003) (citing *Acra, Inc. v. United States,* 44 Fed. Cl. 288, 293 (1999)), *aff'd*, 365 F.3d 1345.

Konecranes argues in the alternative that the Army's decision to assign IMPSA a "low" risk rating for the ISO certification subfactor (rather than a higher risk level) was arbitrary and capricious. Pl.'s Mot. at 12; Tr. at 15.

First, Konecranes argues that IMPSA S.A.'s ISO certification does not explicitly include crane manufacturing. Pl.'s Mot. at 13–14; Tr. at 17. The quality management system covered by the certification encompasses a wide range of activities including "manufacturing, assembly, installation, … and technical assistance for equipment and civil works; through contracts for the supply of separate pieces of equipment." AR 2025. IMPSA represented that the certification would cover its performance. AR 3397. The ISO certification's references to, *e.g.*, "equipment" and "civil works" could be interpreted to encompass IMPSA's proposal for crane manufacturing, especially given other indications in the record that IMPSA manufactures cranes. *See* AR 258–60. The Army requested additional information to verify that IMPSA S.A.'s certification would apply to IMPSA's performance, AR 3396, and IMPSA represented that the certification covered IMPSA's manufacturing facilities, AR 3397. Thus, the SSA had a rational basis for rating IMPSA's reliance on IMPSA S.A.'s certification as a low risk. *Impresa*, 238 F.3d. at 1333 (quotes omitted) (citing *Saratoga Dev. Corp.*, 21 F.3d at 456).

Second, Konecranes contends that the certification only covers IMPSA S.A. locations in Argentina and does not extend to IMPSA or to other locations where

IMPSA represents that manufacture will take place. Pl.'s Mot. at 13–14. As for the locations covered by the certification, the RFP appears to assume that ISO 9001 certification covers a "quality system" rather than specific work locations.[6] AR 1529 § M.4.1.1.1. Konecranes has provided no evidence that an ISO certification applies to a performance location rather than a management system.[7] Further, agencies are permitted to credit the performance or experience of a parent company to an offeror if the proposal demonstrates that the resources of the parent company will be available to the offeror. *Femme Comp Inc., v. United States*, 83 Fed. Cl. 704, 746 (2008); *see also PricewaterhouseCoopers Public Sector, LLP v. United States*, 126 Fed. Cl. 328, 353 (2016); *Bender Shipbuilding & Repair Co. v. United States*, 297 F.3d 1358, 1360–62 (Fed. Cir. 2002). IMPSA represented to the Army that IMPSA S.A.'s certification covers a quality management system applied across the entire enterprise, including IMPSA. AR 3397. The other arguments Konecranes raises about IMPSA's contract risk — *e.g.*, reliance on to-be-determined foreign contractors — are plausible, but within the SSA's discretion to weigh. *E.g.*, Pl.'s Resp. & Reply at 8. That leaves no basis to overturn the Army's decision to treat the certification as covering IMPSA S.A.'s manufacturing system as a whole.

### 2. Price Evaluation

The other evaluation factor relevant here is price reasonableness. As mentioned, the Army considered both IMPSA's and Konecranes's prices reasonable. AR 2744–51, 2783–84. Konecranes argues that each of the Army's three bases for finding IMPSA's pricing reasonable were arbitrary and capricious. Pl.'s Mot. at 22–26. According to Konecranes, (1) the two offerors' prices were too different for the Army to draw any reasonableness conclusions, Pl.'s Mot. at 23; Tr. at 46, (2) comparison to the Army's IGCE was not meaningful because it did not properly estimate the price of delivering the cranes, Pl.'s Mot. at 24, and (3) IMPSA's pricing

---

[6] The GAO has stated that "ISO 9001 certifications are issued to cover specific quality management systems[,] not specific entities." *See Qbase, LLC, et. al.*, B-416377.9–.14, 2020 C.P.D. ¶ 367, 2020 WL 6799077 at 9 (Nov. 13, 2020). GAO opinions, although not binding on this Court, can be persuasive. *See Allied Tech. Grp., Inc. v. United States*, 649 F.3d. 1320, 1331 n.1 (Fed. Cir. 2011). But because the GAO in *Qbase* did not provide any explanation or evidence, its opinion does not carry any particular persuasive power.

[7] To support its characterization of ISO certification, Konecranes points only to a non-public white paper on a private company's website. Pl.'s Mot. at 12–13 & n.2. The white paper is not in the administrative record, *see* Tr. at 9–10, and thus outside the normal scope of this Court's review. *See GW Government Travel, Inc. v. United States*, 110 Fed. Cl. 462, 479 (2013); *see also* 5 U.S.C. § 702, 706(2)(A); *Impresa*, 238 F.3d at 1332. Nor is there any basis for judicial notice of the white paper's unknown contents. Fed. R. Evid. 201(c)(2); *see Confidential Informant 59–05071 v. United States*, 134 Fed. Cl. 698, 711 (2017), *aff'd*, 745 Fed. App'x 166 (Fed. Cir. 2018).

is speculative because IMPSA's proposal left locations of performance to be determined, Tr. at 51.

To begin with, Konecranes concedes that it cannot argue IMPSA's proposed price was too low. Tr. at 42. As the Federal Circuit has explained, "[p]rice reasonableness generally addresses whether a price is too *high*[.]" *See Agile Defense, Inc. v. United States*, 959 F.3d 1379, 1384 (Fed. Cir. 2020) (quoting *First Enter. v. United States*, 61 Fed. Cl. 109, 123 (2004)) (internal quotes omitted; emphasis added). Evaluation of whether a price is too low calls for a cost *realism* analysis, *id.*; FAR 15.404-1(d), which the RFP did not call for and which the Army therefore was not permitted to perform.[8]

Konecranes also concedes that if the Court rejects its arguments about other aspects of the procurement, its challenge to the Army's reasonableness determination would have to be rejected as well for lack of prejudice. *See* Tr. at 44; *Bannum, Inc.*, 404 F.3d at 1354. As discussed elsewhere in this Opinion, none of Konecranes arguments outside price reasonableness have merit. Thus, even if the Army's price-reasonableness determination were flawed, Konecranes cannot show prejudice.

Even so, at least one ground for the Army's price-reasonableness determination — its comparison of IMPSA's price to the Army's IGCE — has support in the record. *See Veteran Shredding, LLC v. United States*, 146 Fed. Cl. 543, 579 (2019); *Nutech Laundry & Textile, Inc. v. United States,* 56 Fed. Cl. 588, 594 (2003). The ICGE was based on cost estimates from a previous procurement for a similar crane, adjusted for inflation using the Producer Price Index. AR 366. Konecranes quibbles with the Army's choice of baseline, mainly because of the wide range of proposed prices. Pl.'s Mot. at 24. Yet even if the comparison was debatable — as historical analogies inevitably are — Konecranes has no evidence that it was irrational. *See Veteran Shredding*, 146 Fed. Cl. at 580 (finding that an agency's use of historical prices to develop an IGCE was sufficient).

Konecranes next argues that the IGCE failed to fully account for inflation of labor, materials, equipment, and shipping costs. Pl.'s Mot. at 23–27; AR 366–69.

---

[8] One rationale for considering only whether a price is too high at the price evaluation stage has been that in a fixed-price contract like this one, the contractor bears the risk of loss if performance is more expensive than expected. *First Enter.*, 61 Fed. Cl. at 124; *Labat-Anderson, Inc. v. United States*, 50 Fed. Cl. 99, 106 (2001). That explanation is incomplete because the government does, in reality, bear some of the risk. A contractor surprised by the cost of performance can simply default: Whatever contractual remedies the Army may have, it could be left with half-finished cranes at the time when it needed and expected complete ones. A better explanation might be that an offeror's ability to perform is relevant to the responsibility analysis, *see* FAR 9.104-1, which substitutes for price realism to some extent.

Assuming those arguments go to price reasonableness (as opposed to whether IMPSA's price was too low), they fail.

The examples Konecranes provides all relate to additional inflation in 2022 — the year *after* the IGCE was prepared and offers with price proposals were submitted. *See* Pl.'s Mot. at 23–27; AR 2784, 2303. Those developments, standing alone, do not cast doubt on whether the IGCE was rational at the time it was prepared, for the Army obviously could not have accounted for actual 2022 inflation in early 2021. Konecranes objects that the Agency used a Producer Price Index dataset with data missing after 2015 and failed to account for the effect of the COVID-19 pandemic on inflation. Pl.'s Mot. at 25. But the Army — which documented the basis for its estimates through the IGCE, *see* AR 371–75 — explained that it projected the inflation rate using historical data. AR 373. Even if that assumption turned out to be incorrect, Konecranes provides no reason to think it was irrational when made.

And even if the IGCE turned out to underestimate future inflation, the IMPSA and Konecranes price proposals both preceded the additional inflation as well. Because the government and the bidders all faced the same price uncertainty, the Army reasonably made an apples-to-apples comparison.

## B. Independent Requirements

Besides arguing that the Army did not evaluate the proposals in accordance with the RFP, Konecranes claims the Army misapplied the FAR responsibility determination requirements and the processes that ensure compliance with the TAA. *See* Pl.'s Mot. at 17–22; Pl.'s Resp. & Reply at 23–30. I conclude that the Army complied with the law.

### 1. *Responsibility Determination*

As to the responsibility determination, Konecranes first argues that the Army violated the requirement that a contracting agency treat all offerors fairly and equitably. AR 3302–3312, 1381; Pl.'s Mot. at 17–19; FAR 1.602-2(b), 1.102-2. Konecranes asserts that the Army collected significantly less information from IMPSA than Konecranes, Tr. at 28, and that the DCMA survey of IMPSA was never properly completed. Pl.'s Resp. & Reply at 10.[9]

---

[9] This Court reviews an "agency's responsibility determination if there has been a violation of a statute or regulation, or alternatively, if the agency determination lacked a rational basis." *Impresa*, 238 F.3d at 1332. "Responsibility decisions are largely a matter of judgment, and contracting officers are normally entitled to considerable discretion and deference in such matters." *Bender*, 297 F.3d at 1362; *see also Sup. Foodservice GmbH v. United States*, 112 Fed. Cl. 402, 415 (2013); *News Printing Co. v. United States,* 46 Fed. Cl. 740, 746 (2000).

Although FAR 1.602-2(b) requires that a contracting agency "ensure that contractors receive impartial, fair, and equitable treatment," prospective contractors "need not be treated the same." FAR 1.102-2. For an unsuccessful offeror to prevail on a disparate treatment claim, it must be similarly situated to a successful offeror. *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020).

Konecranes and IMPSA are not similarly situated. The DCMA conducted the evaluation of Konecranes's facilities and capabilities during the pre-award survey because its manufacturing location was in the United States. AR 3302–12. IMPSA's pre-award survey was canceled because the cranes would be manufactured in a different country. AR 3302–12; Supp. AR 3581. Instead, the Army issued an evaluation notice asking IMPSA to identify the designated country from which it would deliver the cranes. AR 2356–59. Although the Army asked IMPSA questions, it did not include a site visit in part because IMPSA's manufacturing location was yet to be determined. AR 2527. In short, the Army had to collect different information using different mechanisms because of differences between the proposals.

Konecranes asserts that the pre-award survey of IMPSA was insufficient and that the Army should have requested additional information about IMPSA's manufacturing capabilities and delivery experience. Tr. at 27; Pl.'s Resp. & Reply at 9–11. But "[c]ontracting officers are 'generally given wide discretion' in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination." *Impresa,* 238 F.3d at 1334–35 (quoting *John C. Grimberg Co. v. United States,* 185 F.3d 1297, 1303 (Fed. Cir. 1999)). The solicitation gives the Army the right to request additional information, but it does not require the Army to request any piece of information; the Army can decide what information to request. AR 535 § M.3.6.

Second, Konecranes argues that the Army misapplied the requirements for a responsibility determination. Pl.'s Mot. at 19–22.[10] Konecranes asserts that the Army erred by resting its responsibility determination on the resources available to IMPSA's parent company, IMPSA S.A., rather than IMPSA itself. *Id.* at 20.

IMPSA itself has limited resources and no manufacturing capacity. But as mentioned above, IMPSA represented that IMPSA and IMPSA S.A. "operate as an integrated enterprise." AR 3397. As part of a pre-award survey of IMPSA, IMPSA S.A. guaranteed the resources required for performance of the contract. AR 3410. The

---

[10] Before awarding a contract, an agency must determine that the prospective contractor is responsible. FAR 9.103(b). A determination of responsibility must be based on "information clearly indicating that the prospective contractor is responsible[.]" *Id.* The FAR sets out several criteria required for a determination of responsibility. FAR 9.104-1.

Army relied on that representation in its responsibility determination. AR 3403–10, 3461. That was permissible: As this Court has held, "[a]n agency properly may attribute the experience of past performance of a parent or affiliated company to any offeror where the firm's proposal demonstrates that the resources of the parent or affiliated company will affect the performance of the offeror." *Femme*, 83 Fed. Cl. at 747 (quoting *Hot Shot Express, Inc.*, B-290482, 2002 C.P.D. ¶ 139, 2002 WL 1831022 (Aug. 2, 2002)); *see also PricewaterhouseCoopers*, 126 Fed. Cl. at 353; *Bender*, 297 F.3d at 1360–62.

Konecranes relatedly claims that IMPSA failed to satisfy some of the specific requirements for a responsibility determination — in particular, FAR 9.104-1(b), which concerns the ability to comply with the proposed delivery or performance schedule, FAR 9.104-1(d), which requires the prospective contractor to demonstrate a satisfactory record of integrity and business ethics, and FAR 9.104-1(f), which requires that the prospective contractor have the "necessary production, construction, and technical equipment and facilities, or the ability to obtain them." Tr. at 33–35.

The Administrative Record, however, contains evidence relevant to each requirement. The DCMA assessed IMPSA with a moderate risk based on its lack of on-site manufacturing capability and lack of verifiable delivery information, but concluded that the risk could be mitigated with a post-award conference and ultimately recommended award to IMPSA. AR 3399. The Army conducted a review of contracting databases and confirmed that IMPSA was not "listed as disbarred, suspended or otherwise ineligible for award." AR 3461; *see also* AR 3399, 3464; Tr. at 87–88. The Army also confirmed that IMPSA did not have unpaid federal tax liability, was not convicted of a federal felony criminal violation, and had a counterfeit mitigation policy in place. AR 3399, 3463. And once again, the Army reasonably concluded that IMPSA S.A.'s resources would be available to IMPSA. AR 3403–10, 3461. After reviewing IMPSA S.A.'s financial statements, including assets and liabilities, the Army determined that the parent company's resources were sufficient to demonstrate IMPSA's financial responsibility. AR 3403, 3407, 3461. Thus, the Army provided evidence of a rational basis for a responsibility determination as to IMPSA.

Konecranes also asserts that the Army should have conducted a responsibility determination on IMPSA's prospective subcontractors. Pl.'s Mot. at 20–21. No such determination was required. The regulations provided that subcontractor responsibility determinations "*may* affect the Government's determination of the prospective prime contractor's responsibility," but did not require such determinations. FAR 9.104-4 (emphasis added).

Third, Konecranes argues that the Army failed to properly document its responsibility determination under FAR 9.105-2(b). Pl.'s Mot. at 21–22. Although "the contracting officer is not required to explain the basis for his responsibility determination," *Impresa*, 238 F.3d at 1334, Konecranes claims that the Army relied on a computer-generated report rather than performing and documenting the SSA's independent analysis. Pl.'s Mot. at 21–22; *see also* AR 2892. Assuming, as Konecranes contends, that a computer-generated report would not substitute for the judgment required by FAR 9.105-2(b), the Army documented a determination of responsibility based on the SSA's independent judgment during its corrective action following the GAO protest. AR 3462.

Although Konecranes points to a handful of facts and considerations not directly addressed in the SSA's decisions, *e.g.*, Pl.'s Mot. at 20–22, this Court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974), which it is here. In sum, Konecranes has not shown a "clear … violation of applicable statutes or regulations" regarding the responsibility determination. *Impresa*, 238 F.3d. at 1333.

    2.  *Trade Agreement Act*

As explained above, the TAA and its implementing regulations require that the Army could only consider offers for U.S.-made, qualifying-country, or designated-country end products unless certain exceptions applied. 19 U.S.C. §§ 2501 *et seq*.; DFARS 225.401-70, 252.225-7021. IMPSA represented that it would comply and completed a trade agreement certificate. AR 2525, 2527. Konecranes nonetheless contends that IMPSA's cranes will likely be manufactured in Argentina, which is not a qualifying or designated country. Pl.'s Resp. & Reply at 24; *see also* Supp. AR 3579. Konecranes therefore argues that IMPSA's TAA compliance was in doubt, compelling the Army to investigate IMPSA's manufacturing plans in more detail. Pl.'s Resp. & Reply at 25 (citing *Leisure-Lift, Inc.,* B-291878.3, B-292448.2 (Sep. 25, 2003); *Klinge Corp. v. United States*, 82 Fed. Cl. 127, 135 (2008)).

"When a solicitation contains a TAA certification requirement, the agency is entitled to rely upon an offeror's certification." *Klinge*, 82 Fed. Cl. at 135. An exception applies when a proposal contains inconsistencies suggesting that the offeror's representations about TAA compliance should not be taken at face value, in which case more investigation might be required. *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 533–34 (2010); *Klinge*, 82 Fed. Cl. at 135. But no such inconsistencies are evident here. Konecranes points to an internal Army communication (sent before IMPSA's certification) stating that IMPSA's manufacturing would occur in

Argentina. Supp. AR 3577–79. The basis of that statement is unclear, for it does not appear to be directly based on any information reported by IMPSA. It may have been only a misunderstanding that IMPSA corrected when given the opportunity. Konecranes also notes a reference in IMPSA's proposal to a certain manufacturing vendor. *See* Pl.'s Resp. & Reply at 26; Tr. at 63; AR 2047. Konecranes believes the vendor is located in Argentina, but has no record evidence to prove it. Even if Konecranes is correct, the significance of that fact for IMPSA's TAA compliance is speculative.

Thus none of Konecranes's evidence directly contradicts IMPSA's representation that manufacture would be TAA-compliant. The Army was therefore entitled to rely on IMPSA's trade agreement certificate to confirm compliance.

### C. Best-Value Determination

Finally, Konecranes takes issue with the Army's ultimate determination that IMPSA's proposal represented the "best value" to the government. AR 534 § M.1.1. Konecranes argues that the SSA misapplied the RFP's guidelines for identifying a proposal's strengths and adjectival ratings. I find no error.

"It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." *Banknote Corp.*, 365 F.3d at 1355; *see also TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327–28 (Fed. Cir. 1996); *E.W. Bliss Co. v. United States*, 77 F.2d 445, 449 (Fed. Cir. 1996). Agencies "have an even greater degree of discretion when it comes to best-value determinations, as compared to deciding on price alone." *Am. Auto Logistics, LP v. United States*, 117 Fed. Cl. 137, 181 (2014) (citing *Galen Med. Assocs.*, 369 F.3d at 1330).

Konecranes asserts that the SSA should not have rated IMPSA as "outstanding." Pl.'s Mot. at 29, 37. IMPSA's rating rested on the SSA's identification of multiple "strengths" in its proposal. AR 3545. But Konecranes objects that the strengths noted by the SSA were aspects of the proposal that *met* RFP requirements; Konecranes argues that a proposal strength must *exceed* RFP requirements in some way. Pl.'s Mot. at 37. If the Army had identified strengths in that way, Konecranes believes it still would have received an outstanding rating because Konecranes (unlike IMPSA) went beyond the RFP's engineering and testing requirements — for example, by identifying more professional engineers on staff and having inspectors with higher level certifications. Pl.'s Mot. at 32–33.

Konecranes misconstrues the definition of a strength. The Army Source Selection Plan defined a strength as "an aspect of an offeror's proposal that has merit

- 16 -

*or* exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance." AR 423 (emphasis added). The RFP also stated that no evaluation credit would be given for any data beyond the minimum requirements identified in the technical evaluation factors. AR 1529 § M.4.1.2. The RFP's language therefore allows the SSA to assign a strength to a proposal not only when RFP requirements are exceeded, but simply when the SSA thinks it has merit.

As a fallback, Konecranes argues that regardless of whether the RFP required awarding the proposals the same technical rating, the Army should have relied on the differences between the proposals in its best-value determination. Pl.'s Mot. at 32–34; Pl.'s Resp. & Reply at 19. Konecranes's arguments for the superiority of its proposal are not unreasonable in the abstract. But "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss Co.*, 77 F.3d at 449. Just as an agency can decide not to consider Konecranes's supposed advantages in the technical evaluation, it could disregard them for the best-value analysis and emphasize the proposals' wide difference in price. This Court generally should not second-guess an agency's decision to do so.

Besides, Konecranes has not shown that the differences between its proposal and IMPSA's would in fact provide a better value to the government. Konecranes seems to presume that its supposed improvements warranted a higher strength rating or would have added value for the Army, Tr. at 83, but nothing in the record shows why, much less at the level that would justify overturning the SSA's judgment. I therefore find no reason to set aside the best-value determination as arbitrary and capricious.

## CONCLUSION

For the reasons discussed below, Plaintiff's motion is **DENIED** and Defendant's and Defendant-Intervenor's motions are **GRANTED**. The case is **DISMISSED**.

Pursuant to the Court's August 10, 2022 Protective Order (ECF 12), this Opinion has been issued under seal. The transcript of the November 8, 2022 hearing is under seal as well. The parties shall have two weeks to propose redactions and, accordingly, shall file notice of their proposed redactions no later than **May 19, 2023**. To aid the Court's evaluation of the proposed redactions and in light of the "presumption of public access to judicial records," *Baystate Techs., Inc. v. Bowers*, 283 F. App'x 808, 810 (Fed. Cir. 2008) (per curiam), each party shall file a memorandum

explaining why redactions are necessary for each item of information for which a redaction is proposed.

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Stephen S. Schwartz
STEPHEN S. SCHWARTZ
Judge
